IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **AK STEEL CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:10-00415-KD-C** |
| | ) | |
| **DONALD EARLEY,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 29), brief and evidentiary materials in support (Doc. 30)¸ Plaintiff's response, brief and evidentiary materials in support (Doc. 32), and Defendants' reply (Doc. 35).  Upon consideration, and for the reasons set forth herein, Defendants' motion for summary judgment is due to be **GRANTED in part** and **DENIED in part**.

**I.      Procedural History**

On March 11, 2010, Plaintiff AK Steel Corporation ("AK") filed a complaint in the Court of Common Pleas of Butler County, Ohio, against Defendants Donald Earley ("Earley"), Dona Ashby ("Ashby"), and Jonathan Salisbury ("Salisbury") (collectively, "Defendants"), alleging claims for breach of contract, violation of Ohio's Uniform Trade Secrets Act, breach of duty of loyalty, and breach of common-law duties of non-disclosure.  (Doc. 2).  Defendants were served with the Complaint on March 24, 2011, and, on April 21, 2010, Defendants timely removed the case to the United States District Court for the Southern District of Ohio, with jurisdiction based

1

on diversity pursuant to 28 U.S.C. § 1332.  (Doc. 1).  Defendants' answer was filed on April 28, 2010.  (Doc. 3).

On August 3, 2010, the Southern District of Ohio, upon the motion of Defendants (Doc. 6), ordered that the case be transferred to this Court.  (Doc. 12).  On June 1, 2011, Defendants filed their Motion for Summary Judgment on all claims in this case.  (Doc. 29).  AK's response (Doc. 32) and Defendants' reply (Doc. 35) have been timely filed, and the motion is now ripe for consideration.

## II.    Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Rule 56(c) governs procedures and provides as follows:

(1) *Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) *Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) *Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

(4) *Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

Defendants, as the parties seeking summary judgment, bear the initial responsibility of informing the district court of the basis for their motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which they believe demonstrate the absence of a genuine issue of material fact. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment.  Celotex, 477 U.S. at 323.  In reviewing whether the non-moving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor.  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-99 (11th Cir. 1992) (internal citations and quotations omitted), cert. denied, 507 U.S. 911 (1993).  The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment.  Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804, 809 (11th Cir. 2004), cert. denied, 534 U.S. 1081 (2005).

## III.    Facts

Plaintiff AK Steel Corporation is organized under Delaware law and headquartered in Butler County, Ohio.  (Doc. 1-1 at 2, ¶ 2).  It operates seven production facilities in the United States, including one in Rockport, Indiana, known as Rockport Works.  (Id. at 2-3, ¶¶ 2, 7). Defendants Donald Earley, Dona Ashby, and Jonathan Salisbury are all former Rockport Works

employees who resigned and are now employed by ThyssenKrupp in Calvert, Alabama.  (Docs. 6-1, 6-2, 6-3).  Each Defendant resides in Alabama.  (Id.).

Earley began working for AK on August 11, 1997 and was based out of Rockport Works during his entire AK employment tenure.  (Doc. 6-1 at 1, ¶¶ 1-2).  Earley gave notice of his resignation to AK in June 2009, and his last day was June 26, 2009, at which point he held the position of Senior Process Engineer for the Hot Dip Galvanizing Line.  (Id. at 1-2, ¶ 3).  On July 6, 2009, Earley began working for ThyssenKrupp in Alabama as Team Manager for the Hot Dip Galvanizing Line 3, transferring to the position of Quality Manager for the Hot Dip Galvanizing Line in January 2010.  (Id. at 2, ¶ 4).

Ashby began working for AK in March 1999 as a temporary clerk, becoming a full-time employee on July 1, 1999.  (Doc. 6-2 at 1, ¶ 1).  She too was based out of Rockport Works during her entire AK employment tenure.  (Id. at 1, ¶ 2).  Ashby gave notice of her resignation to AK on October 9, 2009, and her last day was October 23, 2009, at which point she held the position of Quality/Safety Coordinator for south finishing, overseeing the quality and safety documents for the shipping, receiving, and galvanizing lines.  (Id. at 1-2, ¶ 3).  On November 2, 2009, she began working for ThyssenKrupp in Alabama as a Technical Specialist for the Cold Rolled Mill.  (Id. at 2, ¶ 4).

Salisbury began working for AK on October 10, 1993, starting at its Middletown, Ohio, facility and transferring to Rockport Works in March 1998, where he worked until resigning from AK.  (Doc. 6-3 at 1, ¶¶ 1-2).  Salisbury gave notice of his resignation to AK around September 14, 2009, and his last day was September 23, 2009, at which point he held the position of Senior Process Control Engineer for the galvanizing line.  (Id. at 2, ¶ 3).  On September 28, 2009, he began working for ThyssenKrupp in Alabama as Lead Technical

4

Specialist Electrical Maintenance, level 2 systems and was thereby in charge of computer systems for several lines.  (Id. at 2, ¶ 4).

Early in their employment with AK, each Defendant agreed by signature to terms contained in a document entitled "Employee Invention and Confidential Information Agreement" ("Employee Agreement")  (Doc. 1-1 at 4-6, 16, 18, 20).  In pertinent part, each Employee Agreement contained the following  provisions (hereinafter referred to as the "Nondisclosure Clause"):

> I recognize that during my employment I will receive, develop, or otherwise acquire various kinds of information which are of a secret or confidential nature. During and after my employment, except as authorized by the Company, I will not disclose or use, directly or indirectly, any information I obtain during the course of my employment relating to inventions, products, product specifications, processes, procedures, machinery, apparatus, prices, discounts, manufacturing cost, business affairs, future plans, customers, ideas, technical data or otherwise which is of a secret or confidential nature (whether or not acquired or developed by me) and which belongs to the Company or to those with whom the company has contracted regarding such information.
>
> Upon termination, for any reason, of my employment, I agree to and shall promptly deliver to the Company all drawings, blueprints, manuals, letters, notes, notebooks, reports, software and all other material which have not been made public relating to the Company's business and which are in my possession or under my control.

(Doc. 1-1 at 16, 18, 20).

In addition, each Employee Agreement states that its "interpretation, application and effect . . . shall be governed by the laws of the State of Ohio."  (Id.).

Before resigning from AK, Earley and Ashby both participated in exit interviews with Tracy Jahn (then Tracy White), Rockport Works' manager of human resources.  (Doc. 30-5 at 3-4; Doc. 30-7 at 7; Doc. 30-8 at 4).  In Earley's exit interview, he and Jahn discussed his reasons for leaving AK and the details of his new job at ThyssenKrupp.  (Doc. 30-5 at 5, 8; Doc. 30-7 at 7).  Ashby does not recall Jahn asking her about why she was leaving.  (Doc. 30-8 at 4).  Jahn

5

did ask her where she was going, the details of her new job, what she thought of the AK managers and the company in general, and if she could recommend someone else to work for AK. (Doc. 30-5 at 7; Doc. 30-8 at 4-5). Jahn does not recall discussing any confidentiality agreement with Earley or Ashby at their exit interviews. (Doc. 30-5 at 12). Salisbury did not participate in an exit interview with Jahn before resigning from AK. (Doc. 30-5 at 6; Doc. 30-9 at 4).

Before leaving AK, Earley sent emails from his AK account to a personal account. (Doc. 30-7 at 9-10). These emails contained vendor contact information, including names of specific contact individuals, and what Earley identifies as information about improvement projects in which he had made or suggested changes. (Doc. 32-3 at 5-7). Earley sent himself the vendor contact information in order to be able to contact those vendors in the future, even after leaving AK. (Id. at 5-6). The vendor information was aggregated into a list, which Earley took with him to ThyssenKrupp. (Id. at 6-7).

Earley also used some of this information to prepare a report for Matt Ludwig ("Ludwig"), the new Rockport Works general manager. (Doc. 30-7 at 9-10; Doc. 32-5 at 2). Earley took it upon himself to create this report because he believed that Ludwig was being lied to by his subordinates about certain issues. (Doc. 30-7 at 9-10). He chose to compose the report outside of work because he "had work to do" during his last days of employment with AK. (Id. at 10). The report dealt with quality issues on the galvanization line, why those issues were not being solved, and what employees were lying to Ludwig. (Id. at 9). During an exit interview with Ludwig, which lasted about an hour and a half, Earley claims he gave Ludwig a copy of the report, which the two men then discussed. (Id. at 11). Ludwig denies that Earley gave him any written report during the interview. (Doc. 32-5 at 2, ¶ 2).

6

Eric Petersen ("Petersen"), AK's Director of Research and Customer Technical Services, has reviewed the information sent by Earley from his AK computer to his personal account shortly before Earley resigned from AK.  (Doc. 32-4 at 2, ¶ 2).  He classifies much of the information as "confidential and proprietary to AK Steel" and claims that it "would give a competitor the advantage of knowing what processes AK Steel has put in place to maintain its high quality achievements and what ways AK Steel has addressed various issues in the production process."  (Id.).  Some of the confidential information Petersen identifies as being sent by Earley are temporary work instructions which "contain highly detailed information about the solutions and improvements that AK Steel had developed to keep various problems from affecting the steel it produces."  (Id., ¶ 3).  Such information, Petersen claims, would save a competitor time and money.  (Id.).

On May 24, 2009, after Earley had left to work at ThyssenKrupp, but before Salisbury resigned from AK, Salisbury emailed Earley a computer program used to convert English units to metric, at Earley's request.  (Doc. 30-9 at 3; Doc. 32-6 at 4-5).  The program is a free utility downloaded from the Internet which many AK employees keep on their computers.  (Id.).  Salisbury is unaware if AK made modifications to the program after downloading it.  (Id.).  Along with the conversion utility, Salisbury attached a file entitled "coil_calc.xls."  (Doc. 35-7 at 32).  Salisbury described the "coil_calc.xls" attachment as something he "whipped . . . together as a going away present" for Earley, who had asked Salisbury about it in the past, and wrote that "[i]t's not very polished but it works."  (Id.).  On July 9, 2009, Salisbury emailed Earley copies of his resume and cover letter for critiquing.  (Doc. 30-9 at 7-12).

Salisbury periodically made backup copies of AK computer files, which typically remained on-site.  (Doc. 32-6 at 5-7).  However, shortly before leaving AK, Salisbury took home

on a thumb drive backup copies of certain files that were stored on the computer he used while at AK.  (Id. at 5).  No one at AK was ever told Salisbury had taken copies of these files.  (Id. at 8). Salisbury claims that he only accessed these files twice: once to retrieve an email address and once to access stored web browser favorites.  (Id.).

While she was still with AK, Ashby also continued to correspond with Earley after he had left for ThyssenKrupp.  On September 21, 2009, while carrying on a discussion with Earley as to what organization method for an instrument department was more efficient, Ashby emailed Earley the Gage Repeatability and Reproducibility History ("GRRH") of certain gauges at Rockport Works, which synopsized the accuracy of those gauges' measurements.  (Doc. 30-8 at 7-10, 22-26; Doc. 32-2 at 11, 15).  Shortly after emailing Earley the GRRH, Ashby also emailed him an AK Inspection, Measuring & Test Equipment list ("IMT"), which identifies a certain line's critical gauges.  (Doc. 30-8 at 27-28; Doc. 32-2 at 5).  In order to email it, Ashby first had to print out a copy of the IMT and then scan it.  (Doc. 32-2 at 13-14).  Ashby obtained the IMT from Rockport Works' password-protected UDMS system, which she would stay logged into throughout her work days.  (Id. at 14).  The GRRH was not obtained from the UDMS system. (Id.).  Ashby never informed anyone at AK that she was sending Earley this information.  (Doc. 30-8 at 11).

Ashby claims both that Earley requested the GRRH and IMT during their efficiency discussion and that she provided it to illustrate her viewpoint on the matter.  (Doc. 30-8 at 10-11; Doc. 32-2 at 11).  Earley claims he requested it as material for a presentation he was putting together at ThyssenKrupp.  (Doc. 30-7 at 15).  At the request of Dr. Bertram Ehrhardt, a researcher in ThyssenKrupp's quality assurance department, Earley was to frame a discussion about whether instrument calibration should be performed in-house or by an outside contractor.

8

(Doc. 32-3 at 8, 12-15).  Earley claims that the IMT he requested is generic information which can be obtained off then Internet if one "want[s] to spend the time to do it[,]" though Earley decided to ask Ashby for it and the GRRH to save time.  (Id. at 9, 11, 15).  Ashby provided him the information a day after he requested it.  (Id. at 9).  ThyssenKrupp did not specifically request that Earley obtain information from AK, nor was ThyssenKrupp ever shown the documents Ashby sent him.  (Id. at 13, 15).

Petersen classifies the information in the GRRH and the IMT as containing "highly detailed specifications about processes that AK Steel has developed to maintain and improve the quality of its products."  (Doc. 32-4 at 3, ¶ 4).  The information in the GRRH was produced in-house by AK studies and was regularly provided to outside auditors from Steel Related Industries Quality System Registrar, Inc. ("SRI").  (Doc. 30-4 at 17, 20-21; Doc. 30-7 at 14-15; Doc. 30-8 at 8, 12-13; Doc. 32-2 at 9; Doc. 32-4 at 3, ¶ 7).  With the IMT, customers would decide what critical measurements to use, and AK would then decide what instruments would be used to meet those specifications.  (Doc. 32-2 at 5-6).  More than one-third of the information on the IMT Ashby sent was developed internally at AK rather than having been taken from manufacturer guidelines.  (Doc. 32-4 at 3, ¶ 5).

The devices listed on the GRRH and the IMT are available on the open market to any who wish to purchase them.  (Doc. 30-4 at 18-19).  Additionally, at least three times while he was working for AK and with the approval of one of his superiors at AK, Earley shared certain of this information with the American Iron and Steel Institute, a trade organization, though the information shared with the trade organization was not in list form and was more generic than what Ashby sent to Earley.  (Doc. 30-7 at 12-13; Doc. 32-3 at 10-11).  When asked why he did not try to obtain this information from the trade organization, Earley stated that he "could get

9

more specific information on Drever Furnace" directly from Ashby. (Doc. 30-7 at 12). Petersen claims that while some of this information is shared with trade organizations, the information is limited to that which is publicly available or does not compromise AK's competitive advantage. (Doc. 32-4 at 3, ¶ 6). Additionally, while AK has at times provided SRI with sensitive or confidential information as part of quality audits to maintain certification under certain standards required by many of AK's customers, SRI has entered into written agreements with AK that prevent it from disclosing information learned during its audits. (Id., ¶ 7).

When she left her employment with AK, Ashby took with her a binder of information, including "AK quality policies [and] corporate level stuff," which she had used at AK to help her prepare for audits. (Doc. 32-2 at 16-17). In her words, they were "kind of the rules you'd gone by to – when you do an audit." (Id. at 17). The binder had been packed with Ashby's personal items which she took from AK upon leaving. (Id.). After the commencement of this action, Ashby turned the binder back over to AK after being asked by a lawyer if she was in possession of anything from AK. (Id.). Before that, Ashby had kept the binder at her house but had never referenced it after leaving AK. (Id.).

IV.    **Analysis**

    a.    <u>Governing Law</u>

Seeming to rely on the choice-of-law provisions in each of the Employee Agreements, the parties have applied Ohio law to all claims in their briefing. However, this action was removed to federal court on the basis of diversity jurisdiction, and it is well-settled that "a federal court in a diversity case is required to apply the laws, including principles of conflict of laws, of the state in which the federal court sits." <u>Manuel v. Convergys Corp.</u>, 430 F.3d 1132, 1139 (11th

Cir. 2005) (citing <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941)).[1]  As to tort

claims, Alabama courts apply the substantive law of the place of injury (here, Ohio).  <u>Fitts v.</u>

<u>Minn. Mining & Mfg. Co.</u>, 581 So. 2d 819, 820 (Ala. 1991).  By contrast, Alabama courts hold

that contract claims are governed by the laws of the state where the contract was made, unless

the contracting parties chose a particular state's laws to govern their agreement.  <u>Cherry, Bekaert</u>

<u>& Holland v. Brown</u>, 582 So. 2d 502, 506 (Ala. 1991).  Because Earley, Ashby, and Salisbury's

Employee Agreements state that their "interpretation, application and effect . . . shall be

governed by the laws of the State of Ohio," (Doc. 1-1 at 16, 18, 20), the Court will apply Ohio

law to both AK's tort claims and its breach of contract claim.

      b.    <u>Breach of Contract</u>

In Ohio, "[t]he essential elements of a cause of action for breach of contract are the

existence of a contract, performance by the plaintiff, breach by the defendant and resulting

damage to the plaintiff."  <u>Winner Bros. v. Seitz Elec., Inc.</u>, 912 N.E.2d 1180, 1187 (Ohio Ct.

App. 2009) (internal quotations omitted).[2]  The Court addresses each element in turn.

---

[1]    In a supplemental brief ordered by the Court, Defendants assert that Ohio's choice of law
rules should apply because this action was transferred to this Court from the Southern District of
Ohio.  Defs.' Br. Regarding Which State's Law Applies to the Non-Contract Claims in This Case
(Doc. 40) at 5 ("[T]he transferee court is 'obligated to apply the state law that would have been
applied if there had been no change of venue.'" (quoting <u>James Ventures, L.P. ex rel. Alpert v.</u>
<u>Timco Aviation Servs., Inc.</u>, 315 F. App'x 885 (11th Cir. 2009))).  However, as the Eleventh
Circuit noted in <u>James Ventures</u>, the post-transfer exception to the general rule set forth in
<u>Klaxon</u> does not apply where, as here, the transferor court lacked personal jurisdiction of the
defendants.  <u>See</u> <u>James Ventures</u>, 316 F. App'x at 888 ("When the transferor court lacked
personal jurisdiction over the defendant, the transferee court must apply the law of the state in
which it sits.").

[2]    The Eleventh Circuit recently provided guidance as to the manner by which a federal court
should evaluate state law:

        Where the [state's] highest court . . . has spoken on the topic, we follow its rule.
        Where that court has not spoken, however, we must predict how the highest court
<i>(continued…)</i>

*Existence of a contract*

The Employee Agreements signed by Defendants are valid contracts. Though Defendants note that their superiors at AK were not familiar with or aware of the confidentiality provisions contained in their respective agreements, none of the Defendants has denied the authenticity of the signatures thereon. Nor has any Defendant alleged that he or she was misled or unduly coerced into signing his or her agreement.

*Performance by the plaintiff*

AK has performed under the Employee Agreements, each of which states that the signatory agrees to be bound by its obligations "in accepting or continuing employment" with AK.[3] (Doc. 1-1 at 16, 18, 20). It is undisputed that AK provided each Defendant with many years of employment.

*Breach by the defendant and resulting damages*

AK has presented little evidence that would show how, if proven, Defendants' breaches of their Employee Agreements have damaged it. AK all but concedes its inability to prove damages, arguing instead that this case should proceed to trial by virtue of its prayer for

---

would decide th[e] case. Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc., 420 F.3d 1317, 1326 n.5 (11th Cir. 2005). Decisions of the intermediate appellate courts . . . provide data for this prediction. Bravo v. United States, 577 F.3d 1324, 1325 (11th Cir. 2009) (per curiam) (citing West v. Am. Tel. & Tel. Co., 311 U.S. 223, 237, 61 S. Ct. 179, 183, 85 L. Ed. 139 (1940)). As a general matter, we must follow the decisions of these intermediate courts. Allstate Life Ins. Co. v. Miller, 424 F.3d 1113, 1116 (11th Cir. 2005). But we may disregard these decisions if persuasive evidence demonstrates that the highest court would conclude otherwise. Id.

Molinos Valle Del Cibao, C. por A. v. Lama, 633 F.3d 1330, 1348 (11th Cir. 2011).

[3]   Armco Steel Company, L.P. is the named as the employing company in Salisbury's Employee Agreement. (Doc. 1-1 at 20).

injunctive relief.  Though the Supreme Court of Ohio has held that "in a case where a plaintiff proves breach of contract <u>at trial</u> but fails to prove actual damages resulting from that breach, <u>the trial court</u> may enter judgment for the plaintiff and award nominal damages," <u>DeCastro v. Wellston City Sch. Dist. Bd. of Educ.</u>, 761 N.E.2d 612, 615 (Ohio 2002) (emphasis added), that court has also noted that summary judgment may be granted to a defendant "where the plaintiff has failed to provide evidence of economic damages resulting from a breach of contract and has failed to seek injunctive relief or specific performance of a contractual duty." <u>Id.</u> at 617.  Here, AK has sought injunctive relief to, among other things, enforce the Employee Agreements. (Doc. 1-1 at 10, 12).  Therefore, as to AK's breach of contract claim, failure to prove actual damages may not be fatal, provided that AK has a viable claim to injunctive relief.[4]

The Nondisclosure Clauses of Defendants' Employee Agreements could have been breached in either or both of two ways.  First, a Defendant may have, without AK's authorization and during or after his or her employment with AK, "disclose[d] or use[d]" information obtained "during the course of [his or her] employment . . . which is of a secret or a confidential nature . . . and which belongs to [AK] or to those with whom [AK] has contracted regarding such information." (<u>Id.</u> at 16, 18, 20).  Second, a Defendant may have, "[u]pon termination" of his or her employment with AK, failed to "promptly deliver" to AK "material[s] which have not been

---

[4]    The parties shall, on or before September 1, 2011, file briefs regarding 1) the propriety and utility of an order granting the injunctive relief sought in AK's Complaint and 2) whether, given AK's insufficient showing of proof as to economic damages, the amount in controversy exceeds $75,000 such that subject matter jurisdiction lies in this Court.  <u>See</u> <u>St. Paul Mercury Indem. Co. v. Red Cab Co.</u>, 303 U.S. 283, 289 (1938) ("[I]f, from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed, or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount, and that his claim was therefore colorable for the purpose of conferring jurisdiction, the suit will be dismissed."); <u>see also</u> <u>Federated Mut. Ins. Co. v. McKinnon Motors, LLC</u>, 329 F.3d 805, 807 (11th Cir. 2003).

made public relating to [AK]'s business" that are within the Defendant's possession or control. (Id.).

1.      Disclosure or Use of "Secret" or "Confidential" Information

As to an alleged violation of the first variety, the critical determinations to be made are whether the information 1) was used or disclosed (and, if so, whether such use or disclosure was "authorized"); 2) was "of a secret or a confidential nature," 3) belonged to AK, and 4) was obtained "during the course of" a Defendant's employment with AK.

a.     *Vendor contact information (Earley)*

Earley does not dispute that, while employed by AK, he sent vendor contact information from an AK email account to one of his personal email accounts and made contact with those vendors when later employed by ThyssenKrupp.  (Doc. 32-3 at 5-7).  Granting every justifiable inference to AK, see Tipton, 965 F.2d 994, 998-99, it may be inferred that, in order to facilitate those contacts, Earley used the information he had sent to himself via email and, further, that such use was not authorized by AK.  It is clear that Earley obtained the contact information during his employment with AK, but a genuine dispute exists as to whether the contact list was confidential and/or "belong[ed]" to AK.[5]  AK will bear the burden of proving those facts, should this matter proceed to trial.

---

[5]    Though some courts have recently questioned the protectability of contact information given the "exponential proliferation of information made available through full-blown use of the Internet and the powerful tools it provides to access such information," see, e.g., Sasqua Group, Inc. v. Courtney, No. CV 10-528(ADS)(AKT), 2010 WL 3613855, at *22 (E.D.N.Y. Aug. 2, 2010), the Supreme Court of Ohio has held that a list of contact persons, addresses, and telephone numbers can be of a secret nature even if such a list can be independently replicated. Fred Siegel Co. v. Arter & Hadden, 707 N.E.2d 853, 863 (Ohio 1999).

>           b.        *Improvement project information (Earley)*

Earley admits that, before resigning from AK, he emailed himself information regarding improvement projects that he then used information to prepare a report for the General Manager at Rockport Works.   (Doc. 30-7 at 9-10).   There is no question that Earley obtained the information during his employment with AK, but AK has not made a sufficient showing that Earley's use of that information for the purpose of creating a report for one of his superiors at AK, while he was still an AK employee, was unauthorized.   More significantly, AK also has not shown that Earley used this information at any point after his employment with AK. Accordingly, there is insufficient evidence to sustain AK's claim that Earley's use of the improvement project information breached the Employee Agreement.

>           c.        *IMT and GRRH (Ashby and Earley)*

AK has sufficiently shown that the IMT and GRRH lists that Ashby sent to Earley after Earley had resigned from AK were of a secret or confidential nature such that their disclosure could constitute a breach of Ashby's Employee Agreement.   With regard to the IMT specifically, Petersen declared that many of the figures reported therein – between one-third and nearly all of the entries in certain columns – "were developed internally at AK Steel."   (Doc. 32-4 at 3, ¶ 5). Additionally, Ashby has admitted that the IMT was maintained on AK's password-protected computer system and that, because the system prevented her from emailing the IMT to Earley directly, she endeavored to circumvent the system's security features by printing and scanning the document into an email message.  (Doc. 32-2 at 14-15).

As to the GRRH, AK Steel chemist Stephen Peterangelo testified that that information in GRRHs are "unique" and reveal AK's "technical capabilities of analytical chemistry."  (Doc. 32-8 at 3-4, pp. 78, 80-81).  Ashby testified that the GRRH that she sent to Earley was a "synopsis"

of studies conducted by AK personnel on AK instruments.  (Doc. 32-8 at 8-9).  Seeking to show that the GRRH was not treated by AK as having a secret or confidential nature, Defendants misplace heavy emphasis on the fact that AK shared the GRRH with its outside auditors.  But such disclosures were made pursuant to a confidentiality agreement between AK and its auditor, underscoring AK's efforts to avoid public dissemination of the GRRH.  (Doc. 32-4 at 3, ¶ 7).

Though a factual dispute exists as to whether Ashby's disclosure of the IMT and GRRH breached her Employee Agreement, the express terms of AK's agreement with Earley incontestably foreclose his liability (pursuant to the contract) for soliciting or receiving those materials.  Earley's contract restricts the disclosure and use of information obtained *during the course of his employment with AK.*  (Doc. 1-1 at 16.)  It is undisputed that Earley obtained the IMT and GRRH after he had resigned from AK.  At trial, AK may seek to prove that Ashby breached her Employee Agreement by sending the IMT and GRRH to Earley but not that Earley breached his Employee Agreement by receiving the same from Ashby.

### d.    Conversion utility and Excel file (Salisbury and Earley)

AK alleges Salisbury disclosed two pieces of information in violation of his Employee Agreement.  The first is a conversion utility that had been downloaded from the Internet that Salisbury testified was "a generic piece of free software" that "pretty much everyone at AK had on their desktop."  (Doc. 30-9 at 3; Doc. 32-6 at 4).  Because the conversion utility was neither confidential nor secret, and because the utility did not "belong" to AK, Salisbury's transmission of it to Earley did not breach Salisbury's Employee Agreement.  The second piece is an Excel file entitled "coil_calc.xls" that functioned as a "conversion calculator."  (Doc. 35-7 at 11-12.)  Unlike the IMT and GRRH sent by Ashby, the conversion calculator did not contain any data specific to AK processes.  (Id. at 32-34).  Furthermore, AK has not made any showing that the

Excel file was regarded as having a secret or confidential nature.  Accordingly, AK has not demonstrated that a dispute exists as to whether Salisbury used or disclosed any information in violation of his Employee Agreement.

2.      Failure to Promptly Deliver Non-Public Materials

The only two pieces of non-public information that AK claims were improperly  retained in violation of its Employee Agreements with the Defendants are 1) the binder of "AK quality policies [and] corporate level stuff" that Ashby kept at her home after resigning from AK (Doc. 32-2 at 16-17), and 2) a thumb drive containing certain unidentified backup files that Salisbury took home with him two weeks before he resigned from AK.  (Doc. 32-6 at 5). AK has not set forth any evidence of Earley having retained non-public materials, and a breach cannot be proven as to him on the basis of improper retention.

Though Ashby and Salisbury breached their Employee Agreements by not promptly returning certain documents and files, AK again failed to show any resultant damages. Injunctive relief is moot — and a cause of action for breach of contract based on improper retention cannot lie — absent proof that Ashby and/or Salisbury still have possession or control of non-public AK information.  See DeCastro, 761 N.E.2d at 617.

AK has not challenged Ashby and Salisbury's testimony that they no longer have any AK materials that they once possessed.  See Doc. 35-2 at 7 (after commencement of this action, Ashby returned the binder to AK); Doc. 35-3 at 6 (Salisbury gave all thumb drives to his attorneys).  Accordingly, injunctive relief is unavailable to AK, and the only two possible avenues to success on AK's breach of contract claim are to prove either unauthorized use of confidential contact information by Earley or unauthorized disclosure of the IMT and GRRH by

17

Ashby.  Defendant Salisbury's motion for summary judgment on the breach of contract claim will be granted.

        c.    <u>Misappropriation Under Ohio's Uniform Trade Secrets Act</u>

Under Ohio's Uniform Trade Secrets Act ("OUTSA"), "a complainant in a civil action is entitled to recover damages for misappropriation."  Ohio Rev. Code Ann. § 1333.63(A) (West 2004).  OUTSA defines "misappropriation" as:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;
>
> (2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:
>
>> (a) Used improper means to acquire knowledge of the trade secret;
>>
>> (b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;
>>
>> (c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

<u>Id.</u> at § 1333.61(B).  The Act further defines "trade secret" as information that satisfies both of the following:

> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Id. at § 1333.61(D).  In the context of the statute, "improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  Id. at § 1333.61(A).

The Supreme Court of Ohio has adopted the following six factors in analyzing what constitutes a trade secret:

> (1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

State ex rel. The Plain Dealer v. Ohio Dep't of Ins., 687 N.E.2d 661, 672 (Ohio 1997).  An entity claiming trade secret status bears the burden of identifying and demonstrating that the material at issue is included in the categories of protected information under the statute.  Id.  AK has not demonstrated that it can meet this burden as to any of the material at issue in this case.

*Materials emailed by Earley to his personal account*

According to his declaration, Petersen, AK's research director, reviewed the information that Earley sent to his personal email account before he resigned from AK.  (Doc. 32-4 at 2, ¶ 2). Petersen declared "[m]uch" of the information to be "confidential and proprietary to AK Steel" and sufficient to "give a competitor the advantage of knowing what processes AK Steel has put in place to maintain its high quality achievements and what ways AK Steel has addressed various issues in the production process."  (Id.).  However, the only specific piece of information that Petersen identifies are certain temporary work instructions, which he claims "contain highly detailed information about the solutions and improvements that AK Steel has developed to keep various problems from affecting the steel it produces" and "would allow a competitor to benefit

from the research AK Steel has done and from the process improvements that AK Steel has tested and refined, all of which would save the competitor much time and money." (Id., ¶ 3).

The Court must put aside Petersen's conclusory assertions.  See State ex rel. Besser v. Ohio State Univ., 732 N.E.2d 373 (Ohio 2000) (conclusory affidavits insufficient to meet the burden of establishing trade secret status).  But without them AK has failed to show that either the vendor contact information or temporary work instructions is a trade secret, was acquired by improper means, or was used or disclosed in violation of § 1333.61(B)(2).

*Material emailed by Ashby and Salisbury to Earley*

In similar fashion to his assessment of the information discussed above, Petersen conclusorily claims that the information sent by Ashby to Earley – namely the IMT and GRRH – "contains highly detailed specifications about processes that AK Steel has developed to maintain and improve the quality of its products."  (Doc. 32-4 at 3, ¶ 4).  But AK has not presented sufficient evidence as to the value to AK of having this information as against competitors; the amount of effort or money expended in obtaining and developing the information; or the amount of time and expense it would take for others to acquire and duplicate the information – three of the six Plain Dealer factors.  Instead, AK focuses its argument most strongly on the third of those factors, i.e., whether precautions were taken to guard the information.  But, of all the information at issue in this case, only one piece, the IMT, was protected by a password-controlled system. More fundamentally, AK has made no showing, as it must, as to the independent economic value it derives from the IMT and GRRH not being generally known to or readily ascertainable by other persons.  See § 1333.61(D)(1).  Accordingly, the Court finds that none of the information sent by Ashby is a trade secret.

As discussed above, AK also has not shown that either the Internet-derived conversion tool or Excel-based conversion calculator that Salisbury sent to Earley was secret or non-public. As with the IMT and GRRH, AK has made no showing as to the independent economic value it derives from these tools, and, as with the IMT and GRRH, the Court finds that the materials that Salisbury disclosed to Earley were not trade secrets.

The Court finds that AK's statutory misappropriation claim fails as to each Defendant, as AK has not shown that any of the material taken from AK by the Defendants is a trade secret as defined by Ohio law.  Defendants' motion for summary judgment will be granted as to Count 2.

   d.  <u>Breach of Duty of Loyalty</u>

Under Ohio common law, an employee has a duty to act in the utmost good faith and loyalty toward his or her employer.  <u>Orbit Elecs., Inc. v. Helm Instrument Co.</u>, 855 N.E.2d 91, 100 (Ohio Ct. App. 2006) (citing <u>Connelly v. Balkwill</u>, 116 N.E.2d 701 (1954)).  This duty binds an employee during the employee's period of employment but not thereafter.  <u>See</u> <u>Staffilino Chevrolet, Inc. v. Balk</u>, 813 N.E.2d 940, 954 (Ohio Ct. App. 2004) (former employee owed duty of loyalty to former employer "*prior* to quitting" (emphasis in original)); <u>see also</u> <u>Veterinary Dermatology, Inc. v. Bruner</u>, No. C-040648, 2005 WL 2679628, at *3 (Ohio Ct. App. Oct. 21, 2005) (to withstand summary judgment on breach of loyalty claim, plaintiff bore burden of showing that defendant competed with former employer "during her employment"); <u>Cary Corp. v. Linder</u>, No. 80589, 2002 WL 31667316, at *6 (Ohio Ct. App. Nov. 27, 2002) (duty of loyalty is breached when employee competes with his or her employer, but "'[p]reparing to compete' is not equivalent to 'competing'").

Since AK cannot demonstrate that any of defendants actually competed with AK before resigning, a breach of the duty of loyalty cannot lie.

AK's duty of loyalty claim also fails for lack of evidence as to damages that resulted from any alleged breach.  In its Complaint, AK alleges that Defendants are liable "for damages in an amount to be determined at trial, including the amount of salary paid to Defendants during the period of their disloyalty, as well as other monetary damages and damages that cannot be calculated, and irreparable harm to its reputation, goodwill, and business relations," (Doc. 1-1 at 11, ¶ 58), but the record is utterly bereft of any evidence as to AK's reputation, goodwill, business relations, or harm thereto.  In demanding damages in the amount of Defendants' salaries, AK appears to invoke that "faithless servant doctrine," which was adopted by an Ohio appellate court in Roberto v. Brown County General Hospital, 571 N.E.2d 467 (Ohio Ct. App. 1989).  Essentially, that doctrine holds that, where an employee's disloyalty "permeates" his or her service, the employer can recoup all compensation paid to that employee during the period of the employee's faithlessness.  Id. at 469.  But even if AK had made a sufficient showing that Defendants were disloyal, the evidence before the Court does not indicate that such disloyalty "permeated" Defendants' service.

In the absence of sufficient evidence of a breach by Defendants, any injury to AK, or the quantum of damages for which Defendants are allegedly liable, Defendants are entitled to summary judgment on Count 3 of the Complaint.

      e.    <u>Breach of Common Law Duties of Nondisclosure</u>

Count 4 of AK's Complaint alleges a breach of Defendants' "obligations under the common law not to disclose or use the confidential, sensitive, and proprietary information of AK Steel." (Doc. 1-1 at 12, ¶ 61).  Though both parties appear to assume in their papers that a duty of nondisclosure exists at common law, neither party has cited a single Ohio case recognizing a cause of action for its breach.  Furthermore, the Court's own research has not revealed any

decision outlining the elements of such a cause of action.[6]   Accordingly, as to Count 4 of the Complaint, the Court will reserve decision on Defendants' motion, and the parties are directed to brief the issue, as part of their Joint Pretrial Document (due September 1, 2011), of whether an actionable duty of nondisclosure exists at common law.[7]

## V.      Conclusion

In accordance with the foregoing, Defendant Salisbury's motion for summary judgment (Doc. 29) is **GRANTED** as to **Counts 1**, **2**, and **3**.  Defendants Earley and Ashby's motions for summary judgment (Doc. 29) are **GRANTED** as to **Counts 2** and **3** but **DENIED** as to **Count 1**. Defendants' motion for summary judgment (Doc. 29) is **CARRIED TO TRIAL** as to **Count 4**.

---

[6]   In limited circumstances, Ohio courts have acknowledged the existence of an obligation to maintain confidences separate and apart from a contractual or statutory duty to do so.  See, e.g., Alexander v. Culp, 705 N.E.2d 378 (Ohio Ct. App. 1997) (minister had duty to preserve parishioner's confidences).  A breach of such a duty may be actionable in negligence.  Id. However, on the papers presently before the Court, it is unclear whether AK has stated or can state a cause of action for negligence – particularly in light of its aforementioned failure to make an adequate showing as to any injury caused by Defendants' alleged conduct.  See Ohio Valley Bank v. Copley, 699 N.E.2d 540, 544-45 (Ohio 1997) ("In order to establish actionable negligence, one must show the existence of a duty, a breach of the duty, and an injury resulting proximately therefrom.").

[7]   To the extent that such a duty may exist, it is not clear how Defendants Earley or Salisbury may be liable, given the factual finding above that neither Defendant disclosed confidential material in violation of his *contractual* duty of non-disclosure under the Employee Agreement.

It is **FURTHER ORDERED** that the parties shall, on or before **Thursday, September 1, 2011**, file briefs regarding 1) the propriety and utility of an order granting the injunctive relief sought in AK's Complaint; 2) whether the amount in controversy in this case exceeds $75,000 such that subject matter jurisdiction lies in this Court; and 3) whether a common law duty of nondisclosure is actionable under Ohio common law.

**DONE** and **ORDERED** this the **19**th day of **August 2011**.

 /s/ Kristi K. DuBose                             
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**